# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

00 APR -3 PM 12: 51

U.S. DISTRICT COURT
N.D. OF ALABAMA

STACEY T. SUTTLE,

    Plaintiff(s),

vs.

UNITED PARCEL SERVICE,

    Defendant(s).

]
]
]
]
]
]
]
]
]
]

CV-99-N-0118-S

ENTERED

APR 0 3 2000

## Memorandum of Opinion

Stacey T. Suttle ("Suttle") brings suit under 42 U.S.C. § 2000e, *et seq.*, ("Title VII") against his former employer, United Parcel Service ("UPS"), alleging that he was treated differently because of his race, black. Specifically, Suttle alleges that he was disciplined and ultimately terminated for shortcomings sufficiently similar to the status and conduct of white employees for which such white employees were neither disciplined nor terminated.[1]

The matter is presently before the court on UPS's motion for summary judgment that was filed on January 14, 2000. [Document # 22]. The motion has been fully briefed and

---

[1] Mr. Suttle also makes some rather general and vague allegations about a racially hostile work environment. In his complaint, the plaintiff articulated a number of alleged discriminatory incidents that occurred prior to January 9, 1997, the date that was 180 days before he filed is charge of discrimination with the EEOC. For example, he alleges that Railey made negative comments about him, overrode his decisions, failed to support him, and made scheduling changes without advising him. Additionally, Suttle claims that UPS repeatedly harassed, humiliated, and treated him differently than white supervisors. (Amended Complaint ¶ 17). Finally, he makes the specific allegation that in November of 1996, he was verbally reprimanded because a loaded truck at the dock was not "outbound" in a timely manner. (Amended Complaint ¶ 18). However, the plaintiff's response to the defendant's summary judgment submission is dedicated almost entirely to his termination claim.

Moreover, a careful examination of his deposition and other evidence reveals that these are nothing more than a few somewhat amorphous—in some cases, one might even say petty—incidents of minor job conflicts not uncommon to any group of individuals in any workplace. Other than the plaintiff's generalized and unsupported "sense" or "feeling" that these events were aimed at him because he is black, there is nothing to suggest that any of them were racially motivated or had any racial context. The court sees no reason why any further discussion of them is necessary except to the extent they may be relevant to the plaintiff's primary discipline and termination claims.

38

was, under the court's initial order [Document # 2], automatically submitted for decision on February 29, 2000.  Upon due consideration, the motion for summary judgment will be granted.

## I.    Statement of Facts.[2]

Stacey Suttle began his employment with UPS in 1985 at its Opelika, Alabama, facility ("Opelika Center").  In 1994, he was promoted to a supervisor position, and a year later, was assigned as the full-time supervisor on the night shift, or "p.m. sort."  As the p.m. sort supervisor, Suttle was responsible for overseeing the afternoon operations at the Opelika Center.   His duties included ensuring that the package cars were unloaded properly and the packages sorted for dispatch to UPS's Montgomery, Alabama, and Atlanta, Georgia, hubs for distribution throughout the UPS worldwide system; ensuring that the Next Day Air letters and packages were collected and sorted for dispatch to UPS's hubs for distribution throughout the UPS system; ensuring that all funds collected by package car drivers were properly accounted for; and ensuring that all the package cars were washed, fueled and prepared for the next day's operations.

In August of 1994, Richard Railey ("Railey") took over as center manager of the Opelika Center.  As center manager, Railey was ultimately responsible for all operations at the Opelika Center, but generally, he expected his supervisors to exercise direct control and responsibility over the operation of their shifts.  According to Suttle, his problems

---

[2]In developing the statement of facts in this opinion, the court considered those facts claimed to be undisputed by the parties, the parties' respective responses to those claims, and the court's own examination of the evidentiary record.  These are "facts" for summary judgment purposes only.  They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1984), *cert denied, USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

began when Railey was named supervisor, though the court notes that Railey was on the job more than two years before the first event about which Suttle complains and that it was under Railey's tenure that Suttle was assigned as the full-time "p.m. sort."

In November 1996,[3] there began at the Opelika Center a series of mishaps and accidents that resulted in several serious failures on the part of UPS to service its customers, at least one of whom was important in terms of the amount of business it did with the defendant.

On November 4, 1996, an extra trailer containing packages and letters was not delivered from the Opelika Center to the Montgomery hub at a time when Suttle was the supervisor on the scene and responsible for the movement of the trailer. Apparently, though it was his responsibility to do so, Mr. Suttle did not call the Montgomery hub to request that a tractor be sent from Montgomery to Opelika to pick up and haul the extra trailer to Montgomery. It was not discovered that the extra trailer of packages and letters was not delivered until the morning of November 5, 1996. Suttle's failure to arrange for the extra trailer to be moved to Montgomery resulted in 253 ground service failures and 66 Next Day Air Service Failures on the part of UPS.[4]

_____

[3] As noted, this was more than two years after Mr. Railey became the Opelika Center manager.

[4] The plaintiff generally asserts that he was wrongfully assigned responsibility for this incident. According to him, the incident was due to a shortage of available employees and that no one informed him that there was an extra trailer to be sent to Montgomery. It is undisputed, however, that Mr. Suttle was aware of the number of employees on duty and that it was his responsibility to compensate for the reduced work force. It is also clear that if the plaintiff had kept himself informed of the circumstances and had placed a telephone call to the Montgomery hub, he could have arranged for a tractor to have been brought to Opelika and would have avoided the service failures. Moreover, it was his duty to do so. (Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment p. 9).

3

On April 14, 1997, UPS mishandled a load from a major customer, SMC South ("SMC"). Due to the volume of SMC's business with UPS, the defendant would periodically leave an empty trailer at SMC's premises to be filled by SMC employees and then retrieved by UPS employees. Because SMC's shipping volume fluctuated, there was no established schedule for UPS employees to pick up and deposit its trailers there. Instead, an Opelika Center employee was assigned to call SMC on a regular basis to inquire as to whether UPS needed to pick up or drop off a trailer.

On the date in question, April 14, 1997, Suttle was the UPS employee who was responsible for contacting SMC to determine whether UPS should pick up the SMC trailer. However, he failed to make the required contact and SMC's trailer was not retrieved, though it was ready and SMC had a substantial number of packages ready for shipment. On April 15, SMC contacted the UPS Opelika Center to inquire why the trailer had not been retrieved and the shipments made.

When questioned by Railey about the missed pick up, Suttle stated that he had instructed Bernard Harris ("Harris"), the primary tractor truck driver for UPS, to pick up the trailer. Harris, however, denied that Suttle had instructed him to pick up the trailer. After reviewing the situation, including some inconsistencies in Suttle's statement, Railey concluded that Harris was truthful and that Suttle was not.

Following the SMC incident, Suttle met with Floyd Honts ("Honts"), the District Manager of UPS's Alabama District; Jimmy Holcomb ("Holcomb"), the Division Manager; and Joe Rivera ("Rivera"), the District Human Resources Manager; at the UPS facility in Birmingham. Honts admonished Suttle that his record of service failures was unacceptable

4

and that he would be required to improve his performance. Honts informed Suttle that his next salary increase and his management incentive (stock award) were placed on hold pending further review. Finally, Honts told Suttle that further serious service failures would cause his termination.

Following the meeting, Suttle was required to do a "write-up" in which he acknowledged there was a "serious service failure in Opelika, that [he] had contact with." (Honts Aff. Ex. A). He also articulated steps he would take to ensure that such failures did not occur again and recognized that he would receive no pay raise or MIP (management incentive) for that year, unless they were restored upon review. (Honts Aff. Ex. A). Suttle also acknowledged that "[t]here is no room for error as far as serious service failures go." (Honts Aff. Ex. A). Finally, Suttle wrote "I thanked Jose, Jimmy and Floyd and told each of them that I would not be involved in another serious service failure. This I do understand, the responsibilities and job duties that I must perform." (Honts Aff. Ex. A.).

Approximately one month later, on May 16, 1997, the Opelika Service Center again experienced another service failure in circumstances that placed a major part of the responsibility on Suttle. As a part of its operations in Opelika, UPS maintained a number of "Next Day Air Letter centers." These were unattended drop boxes which shippers used to take advantage of UPS's Next Day Air service. They were typically checked along three routes by employees of the Opelika Center. Two were covered by full-time drivers from the morning shift who were supervised by the "on car supervisor." The other was covered by a part-time driver from the "p. m." shift, under the supervision of Suttle.

5

In May 1997, the driver assigned to do pick ups for the "p.m." route was Curtis Olive. However, because of the unavailability of the regularly assigned driver, Railey instructed Olive to cover the May 17, 1997, morning pick-up in Albany, Georgia, and told him he was not to drive the May 16, 1997, third route in Opelika.

United States Department of Transportation regulations limit the number of hours that a driver may work during any stated period. The undisputed evidence shows that Olive, consistent with those regulations, could not have driven both the Friday letter route in Opelika and the Saturday morning route in Albany, Georgia. Railey has testified that he told Suttle earlier in the week that Olive would not be available on Friday afternoon, and that he, Suttle, should arrange for someone else to cover the letter route on Friday afternoon. Railey contends that Suttle told him he would handle it, and that after being reminded of the situation, Suttle stated that he was going to take care of it.  Moreover, on May 16, Railey asked Suttle if the third route was covered, and Suttle responded it was. Suttle enlisted the services of Greg Wilson ("Wilson") to drive the Friday afternoon letter route in Opelika. Wilson had covered one or more of the full-time driver's letter center pick-up routes in the past but he had not previously covered Curtis Olive's route.  Unfortunately, and without proper instructions, on Friday, instead of covering the "p.m." route in Opelika, he covered one of the full-time driver's routes. The letter centers on Olive's route were not checked, resulting in more service failures.

On May 19, 1997, Suttle again had to ensure that Olive's route was covered.  But, as had been the case with Wilson on the previous Friday, the appointed driver, Mike Nichols ("Nichols"), covered the wrong route. At some point, Suttle realized there might have been

6

a problem and asked another driver, Gary Hall, ("Hall") to cover the afternoon letter centers route. Hall also covered the wrong route. The evidence is that neither Nichols nor Hall were properly instructed about the route they were to cover.

No one at UPS discovered that the boxes had been missed until after the second consecutive missed pick-up day when customers began to complain.[5]

After the two letter center mishaps, Suttle was once again required to do a "write-up" and was suspended from further duties as a supervisor pending an investigation and decision by UPS management.[6] Eventually, the plaintiff met with Honts, Holcomb, and Rivera at UPS's Montgomery facility. After declining an opportunity to resign, Suttle was terminated.[7]

Because of Suttle's suspension, Railey assigned many of his duties to a part-time supervisor, Jay Walker ("Walker"). On May 28 and 29, 1997, UPS suffered more failures with Next Day Air Service and service problems on the night shift. On Tuesday, May 28, 1997, 37 Next Day Air letters were placed on a feeder trailer bound to Pleasantdale

---

[5] Mr. Suttle's response to these incidents is interesting. Essentially, he denies responsibility on the basis that Mr. Railey had given Olive the time off and that he, having given him time off, should have arranged for his replacement. Nevertheless, the evidence is undisputed that it was Suttle who was responsible for covering the "p.m." letter route; that he undertook to cover them; and, that he did not properly instruct the substitute drivers.

[6] The plaintiff claims he was required to "write-up" a document that met with management's approval. That would not be surprising, inasmuch as the purpose of the "write-up" appears to have been to have the offending employee make a written explanation of his failure and to articulate a plan to prevent recurrences. (Plaintiff's Statement of Disputed Facts ¶ 9).

[7] The plaintiff generally denies that he was responsible for any of the serious service failures within the six-month period between November 1996 and May 1997. However, though given specific instructions regarding the summary judgment procedure and how his response should be done, he has failed to offer any *evidence* to refute the defendant's *evidence* on most of the points raised by the motion. Moreover, the court has on more than one occasion urged Mr. Suttle to obtain the assistance of counsel in this matter, explaining that the court is not allowed to assist him. The court has seen nothing to suggest that the plaintiff has made any serious effort to obtain counsel.

7

(Atlanta) rather than with the other Next Day Air packages onto the air shuttle.  On May 29, 20 Next Day Air packages were placed on the Montgomery night feeder truck rather than the Pleasantdale feeder truck.

Following these incidents, Walker and Railey were required to do "write-ups" and to meet with Honts, Rivera, and Holcomb.  At that meeting, Honts informed Railey that any further serious service failures in Opelika would jeopardize his pay increase and management incentive.  Walker was told that if the problems continued, UPS would apply progressive discipline in the form of putting his pay increase on hold, and eventually, dismissal.  Nonetheless, problems continued at the Opelika Center.  On June 3, 1997, a trailer that should have been taken to Montgomery was taken to Pleasantdale, instead.

After learning of the June 3 incident, Holcomb came to Opelika to personally observe the afternoon sort operations.  Railey's pay increase and management incentive were placed on hold, pending review by management.  Moreover, Railey was told that he was at risk to be terminated if there were any further serious service failures in Opelika.  As for Walker, his pay increase was also put on hold.  Both Railey and Walker were required to do "write-ups" concerning the most recent incident.  Following the June 3, 1997, incident, there were no other serious service failures in the Opelika Center.

On July 8, 1997, Suttle filed his charge of discrimination with the Equal employment Opportunity Commission (the "EEOC") and received a right to sue letter on September 30,

8

1998. His complaint was filed in this action on November 9, 1998, in the United States District Court for the Northern District of Georgia.[8]

## II. Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movants can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a

---

[8] The action was subsequently transferred to this district, the Georgia judge apparently believing that Opelika is in the Northern District. It is, in fact, in the Middle District.

genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Celotex*, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 745 n.11(1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249

10

(citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III.   Discussion.

Under Title VII, a plaintiff is required to file a charge of discrimination with the EEOC within 180 days of the defendant's conduct that is alleged to be discriminatory. The consequence of a plaintiff's failure to timely file such a charge is dismissal of the action. 42 U.S.C. § 2000e-5(e); *Thomas v. Kroger Company*, 24 F.3d 147, 150 (11th Cir. 1994). The purpose of the requirement that a plaintiff file an EEOC charge within 180 days of the allegedly illegal act or practice is (1) to give the employer prompt notice of the complaint against it, and (2) to give the EEOC sufficient time to attempt the conciliation process before a civil action is filed. *Grayson v. Kmart Corporation*, 79 F.3d 1086, 1103 (11th Cir. 1996).

Mr. Suttle filed a charge of discrimination on July 8, 1997. The date 180 days prior to July 8, 1997, was January 9, 1997. Accordingly, any cause of action based upon actions

11

alleged to be discriminatory that occurred before January 9, 1997, would ordinarily be

barred as untimely. However, it is now clear that the focus of the plaintiff's claim is his

termination in May of 1997, well within the statutory 180-day period.

In response to the defendant's timeliness argument, Suttle asserts that the actions

of the defendant were continuous, resulting in a single act of discrimination.  Under the

continuing violation theory,

> when an employee charges an employer with continuously maintaining an
> illegal employment practice, he may file a valid charge of discrimination
> based upon that illegal practice until 180 days after the last occurrence of an
> instance of that practice.  However, where the employer engaged in a
> discrete act of discrimination more than 180 days prior to the filing of a
> charge with the EEOC by the employee, allegations that the discriminatory
> act continues to adversely affect the employee or that the employer presently
> refuses to rectify its past violation will not satisfy the requirement of 42 U.S.C.
> § 2000e-5(e) that the plaintiff file his charge of discrimination within 180 days
> of the discriminatory act.

*Gonzalez v. Firestone Fire & Rubber Co.,* 610 F.2d 241, 249 (5th Cir. 1980) *as quoted in*

*Beavers v. American Cast Iron Pipe Co.,* 975 F.2d 792, 796 (11th Cir. 1993).  Unlike

*Gonzalez,* where the plaintiffs challenged an established testing *system* that allegedly led

to discriminatory promotions, and *Beavers,* where the plaintiffs challenged the company's

policy of denying health benefits to children of employees and retirees if those children did

not reside full-time with their eligible parent, Suttle complains of discrete acts of

discrimination.  The evidence of the pre-January 9, 1997, events is slim and, as was noted

earlier, the allegations tend to be both vague and generalized. See, Footnote 1. The ones

that are mentioned, including leaving notes on the plaintiff's car and suffering from

"humiliation, embarrassment and disparate treatment" are not the type that demonstrate

12

a violation continuing into the present. Instead, they are clearly discrete incidents unrelated to each other and connected only by the plaintiff's generalized perception that they were founded in racism.

### A.     The McDonnell Douglas Framework.

Having no "direct evidence" of discriminatory intent and unable to demonstrate a pattern of discrimination through statistics, *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990), the plaintiff here seeks to establish his claims solely on the basis of circumstantial evidence, thus invoking the familiar framework set out in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).[9]

Under the *McDonnell Douglas* framework, a plaintiff seeking to establish a claim based on circumstantial evidence has the initial burden of establishing a prima facie case of discrimination.  "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination."  *Lathem v. Department of Children and Youth Services*, 172 F.3d 786, 792 (11th Cir. 1999) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  In order to establish a *prima facie* case, the plaintiff must introduce evidence of actions taken or decisions made by an employer "from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act."  *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576 (1978).  The burden of production

---

[9] The *McDonnell Douglas-Burdine* burden shifting analysis was not intended to be "rigid, mechanized, or ritualistic."  *Green v. School Bd. of Hillsborough County, Florida*, 25 F.3d 974, 978 (11th Cir. 1994).  Instead, it is meant to be a "sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."  *Id.*

then shifts to the defendant to articulate a "legitimate nondiscriminatory reason" for the allegedly discriminatory employment action. *Lathem*, 172 F.3d at 793. "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted." *Brown v. American Honda Motor Co., Inc.,* 939 F.2d 946, 950 (11th Cir. 1991), *cert denied*, 502 U.S. 1058 (1992) (quoting *Grigsby v. Reynolds Metal Co.*, 821 F.2d 590, 596 (11th Cir. 1987).

Once the defendant presents a legitimate nondiscriminatory reason for its conduct, the presumption of discrimination "drops from the case." *Texas Dep't of Community Affairs v. Burdine* 450 U.S. 248, 255 n.10 (1981). The plaintiff must then prove by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. Conclusory allegations of discrimination are insufficient; rather, the plaintiff must present concrete evidence of pretext in the form of clear and specific facts. *Earley v. Champion*, 907 F.2d at 1083-84. A plaintiff may establish pretext directly by persuading the court that a discriminatory reason more likely than not motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Combs v. Plantation Planters*, 106 F.3d 1519, 1528 (11th Cir. 1997); *see also Bogle v. Orange County Bd. of County Comm'rs,* 162 F.3d 653, 658 (11th Cir. 1998)(declaring that the defendant was not entitled to judgment as a matter of law if plaintiff produced "any evidence that would allow a reasonable jury to disbelieve the proffered reasons for his discharge").

If a plaintiff succeeds in meeting this burden, disbelief of the defendant's proffered reasons, together with the *prima facie* case, is sufficient circumstantial evidence to support a finding of discrimination and to preclude summary judgment. *Combs*, 106 F.3d at 1529. Because of the difficult factual questions involved in assessing an employer's "true motivations," once the plaintiff has presented evidence raising a question about those motivations, summary judgment is ordinarily inappropriate. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If evidence in the record "demonstrate[s] such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's preferred legitimate reasons for its action that a legitimate factfinder could find them unworthy of credence," the final assessment of the employer's motivation must be left to the jury. *Combs,* 106 F.3d at 1538.

### B.     The *Prima Facie* Case.

In order to establish a *prima facie* case of discrimination in this context, the plaintiff must produce sufficient evidence to create a genuine issue of material fact on each of the following matters: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably than he, and (4) he was qualified to perform the duties of his job. *Holifield,* 115 F.3d at 1562.

The defendant argues that Suttle cannot prove that it treated similarly situated employees outside his protected class more favorably than it treated him. Under the similarly situated analysis, Suttle must show that he and the employees are similarly situated in "all relevant respects." *See id.* In making the similarly situated analysis, it is

necessary for the court to consider whether the employees were involved in or accused of the same or similar conduct and were disciplined in different ways. *Id.* "When an individual proves that he was fired but one outside his class was retained although both violated the same work rule, this raises an inference that the rule was discriminatorily applied." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1186 (11th Cir. 1984) *quoted in Lathem*, 172 F.3d at 793. If Suttle fails to demonstrate the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present. *Id.*

First, Suttle points to Railey as one similarly situated employee who committed a similar misdeed but was treated more favorably than was he. First, the plaintiff has failed to produce any evidence that Railey was "connected" with or responsible for any service failures that were of a similar nature and seriousness as was he in November 1996 and April 1997. Both involved trailers full of packages that were either not shipped to their proper destinations or were not picked up from UPS customers. While Railey could be said to have been "connected" to the service failures on May 16 and 19, 1997, his involvement was entirely different from that of Suttle. Railey acted in the capacity of the center supervisor, reassigning Olive to a job where his services were required and relying on Suttle to cover Olive's regular duties. It is important to remember here that Railey was Suttle's supervisor. He made a decision and instructed his subordinate, Suttle, to assign another driver to cover the void. That this is so is demonstrated by virtue of the fact that Suttle did in fact undertake to cover Olive's duties but failed to instruct both Wilson and Nichols as to their duty assignments.

16

There is no dispute in the evidence: (1) that the plaintiff was responsible for the failure of a fully loaded trailer to be sent to Montgomery in November 1996; (2) that he was responsible for seeing that the SMC trailer was retrieved;[10] and (3) among his specific duties as the "p.m." sort supervisor was to ensure that the Next Day Air letters and packages were collected and sorted for dispatch to UPS's hubs for distribution throughout the UPS system.

Suttle has failed to produce significant evidence to establish that Railey was similarly situated in all aspects, or that their conduct was of "comparable seriousness" to the conduct for which he was discharged. *See Holifield*, 115 F.3d at 1563.

The plaintiff also alleges that Walker was a similarly situated employee who received more favorable treatment than did he. Walker, a part-time supervisor, became the "p.m. sort" supervisor after Suttle was suspended. Within a matter of two to three weeks of Walker's appointment, the service center suffered three serious service failures. As described in greater detail in the statement of facts portion of the opinion, on May 28, 1997, Next Day Air letters were misplaced; on May 29, 1997, more letters were misplaced; and on June 3, 1997, a trailer that should have been taken to Montgomery was taken to the Atlanta area. Suttle contends that despite the service failures, Walker did not suffer discipline comparable to his and was not terminated.

---

[10] Mr. Suttle's contention that Railey believed Harris and not him regarding the SMC shipment, even if true, does not imply a racial motive. He essentially says that Harris was a difficult person who would have created a confrontation had Railey believed Suttle instead of Harris. The desire to avoid confrontation does not imply racism. Harris was in fact, like the plaintiff, a black man.

17

While service failures occurred on both Walker and Suttle's watches, they were not similarly situated because of their different levels of experience. Walker was a new supervisor with little experience. Suttle had been on the job as the "p.m. sort" supervisor for almost two years when he was terminated. Foremost, Suttle was involved in four serious service failures over an extended period, suggesting a pattern of failure, while Walker's failures occurred within a few weeks of his promotion to full-time supervisor and over a period of six days.

Assuming *arguendo* that Suttle and Walker's conduct was substantially similar, UPS applied the same progressive discipline to Walker as it had applied to Suttle. For instance, following the May of 1997, accidents, Walker met with Honts, Rivera, and Holcomb and was required to submit a "write-up." Walker was also informed that continued service failures would result in application of the progressive discipline policy and that his pay increase would be placed on hold and that he would eventually be dismissed. This is not dissimilar to the punishment that Suttle received after the loaded trailer and SMC incidents.

After the June incident, Holcomb went to Opelika and placed Walker's pay increase on hold. Additionally, Walker was told that he could not have any more service failures and again, was required to submit a "write-up" regarding the incident. Finally, there is no evidence that after this meeting, Walker was involved in another serious service failure.

### C. Legitimate Non-Discriminatory Reason.

Even if the court should assume that a *prima facie* case has been established, summary judgment in the employer's favor is still appropriate when the defendant articulates a legitimate, non-discriminatory reason for the challenged action and in

18

response, the plaintiff fails to present sufficient evidence of pretext. *See Pace v. Southern Railway Sys.*, 701 F.2d 1383, 1391 (11th Cir. 1983). UPS contends that Suttle was disciplined and terminated for his direct responsibility for a series of service failures at the Opelika Center from November of 1996 to May of 1997. Additionally, following a service failure in April of 1997, Suttle was warned that he would be dismissed for involvement in any future serious service failure. After another failure and after declining a chance to resign, Suttle was terminated.

When a defendant has proffered a legitimate non-discriminatory reason for its actions, the plaintiff must then come forth with evidence to raise a genuine issue regarding whether that reason is merely a pretext for discrimination. *Burdine*, 450 U.S. at 256. Suttle may establish pretext directly by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence. *See id.* However, conclusory allegations of discrimination are insufficient; rather, the plaintiff must present concrete evidence of pretext in the form of clear and specific facts. *Earley*, 907 F.2d at 1083-84.

As to the SMC incident, Suttle acknowledged that race was not a factor in his being disciplined. When asked why Railey believed Harris and not Suttle's explanation for the failure, Suttle did not contend that it was a racial decision—Harris was also African-American—but stated that by accepting Harris's explanation, Railey simply took the path of least resistence. Harris was, in Suttle's view, an assertive individual who would have created a problem had his word not been accepted. (Suttle Depo. p. 118-120). When questioned about this event by UPS management, Suttle admitted his error and thanked

19

them for allowing him to keep his job. (Movant's Statement of Facts in Response to Exhibit D of the Court's Order ¶¶ 30-41). As to the May events, Suttle presents nothing more than his generalized and conclusory views that race played a role in UPS's decision. There is no evidence of clear and specific facts which indicates that Suttle was not responsible for these events, or that the explanations proffered by UPS are unworthy of credence. Instead, the plaintiff has failed to dispute that the events surrounding the Next Day Air failures were under his supervisory responsibilities. Thus, the court finds that a sufficient question of fact has not been presented as to pretext. Accordingly, UPS is entitled to summary judgment as to Suttle's Title VII race discrimination claims.

### D.      State Law Claims.

In his responsive motion, Suttle alleges state law claims for "discrimination and wrongful discharge." To the extent that Suttle attempts to bring a wrongful discharge claim under Alabama law, no such claim is recognized by Alabama law. In *Howard v. Wolff Broadcasting Inc.*, 611 So. 2d 307, 312 (Ala. 1992), Alabama specifically refused to adopt a narrow exception to the employment-at-will doctrine on the basis of discrimination. If Suttle seeks to assert a harassment claim, again, there is no Alabama law that UPS might have violated by its alleged actions.

### IV.     Conclusion.

A review of the record clearly demonstrates that Mr. Suttle enjoyed working for UPS and was extremely disappointed upon being terminated from the company. Nonetheless, such disappointment provides no basis for relief in the absence of a legally cognizable claim, supported by sufficient evidence. The United States Supreme Court, through the

20

*"McDonnell Douglas-Burdine"* analysis, has set out guidelines binding on this court when considering a motion for summary judgment in a race discrimination case. Unfortunately for Mr. Suttle, he has not met his burden under the applicable standard. Foremost, the requisite *prima facie* case has not been established. In particular, the plaintiff has failed to point to a similarly situated nonminority employee in all respects, who received more favorable treatment than he. Additionally, even if the *prima facie* element was established, Suttle has not presented concrete evidence that the defendant's legitimate non-discriminatory reason was merely a pretext for discrimination. Accordingly, the plaintiff has failed to create a genuine issue of material fact as to race discrimination, and summary judgment for the defendant is appropriate. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this ___ of March, 2000.

**EDWIN L. NELSON**
**UNITED STATES DISTRICT JUDGE**
